Robert H. CALHOUN,
Plaintiff, Appellee,

v.

ACME CLEVELAND CORPORATION
and the Cleveland Twist Drill
Company, Defendants, Appellants.

No. 85–1952.

United States Court of Appeals,
First Circuit.

Aug. 20, 1986.

William P. Robinson, III with whom John A. Houlihan, Judith C. Savage, and Edwards & Angell, Providence, R.I., were on brief, for defendants, appellants.

Orlando F. de Abreu with whom Kevin J. McAllister, Taunton, Mass., was on brief, for plaintiff, appellee.

Before BOWNES, Circuit Judge, BROWN,* Senior Circuit Judge, and BREYER, Circuit Judge.

BOWNES, Circuit Judge.

Appellants, Acme Cleveland Corporation and its subsidiary The Cleveland Twist Drill Company, appeal from a judgment for their former employee, Robert Calhoun, under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (1982).

Calhoun had contended that, after working for appellants and their predecessors for forty-two years, appellants entered into a course of action designed to force him into early retirement at age sixty-two. It was appellants' contention that they merely asked Calhoun whether he wished to take early retirement and that Calhoun voluntarily decided that he would retire. Since appellants did not actually fire Calhoun, a key legal and factual issue in the case was whether appellants' actions could be con-

* Of the Fifth Circuit, sitting by designation.

sidered to amount to a constructive discharge. Appellants contend that, as a matter of law, the facts alleged and proven by Calhoun did not amount to a constructive discharge and that the district court erred when it failed to grant appellants' motion for summary judgment, directed verdict or judgment n.o.v. Appellants also claim that they were denied a fair trial because the district court failed to give a requested "anticorporate bias" jury instruction requested by appellants.

■ We consider first the constructive discharge issue. The basic rules governing constructive discharge in this circuit were laid down in *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir.1977): "the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* at 119. This is an "objective standard," *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986), in which the focus is upon the "reasonable state of mind of the putative discriminatee." *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 926 (5th Cir.1982). In making the determination, it must be kept in mind that

> "[a]n employee may not be unreasonably sensitive to his [or her] working environment." *Johnson* [v. *Bunny Bread Co.*], 646 F.2d [1250] at 1256 [ (8th Cir.1981) ]. Thus the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.... An employee is protected from a calculated effort to pressure him [or her] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his [or her] coworkers. He [or she] is not, however, guaranteed a working environment free from stress.

*Bristow*, 770 F.2d at 1255. The question we must consider, then, is whether, given the factual allegations and evidence presented by Calhoun, there was no constructive discharge as a matter of law. This requires a recitation of the facts.

Aside from three years in the Navy during World War II, Calhoun worked continuously for The Cleveland Twist Drill Company or its predecessor from 1940 until his resignation in 1982. By 1964, he had worked his way up to the position of Manager of the Product Design and Application Department. In every year prior to 1982, Calhoun had received good reviews of his work and yearly raises in pay.

By 1982, The Cleveland Twist Drill Company was having financial problems, particularly because it was not delivering orders on time and was not selling reliable merchandise. As a result, a new plant manager, Clifford Preuss, was hired in February of 1982. On February 17, 1982, Preuss asked all employees eligible for early retirement, including Calhoun who was sixty-two at that time, whether they had any intention of taking early retirement so as to minimize layoffs of junior personnel. Calhoun told Preuss that he wished to continue working until he was sixty-five.

On March 10, 1982, without warning or criticism of Calhoun's past performance, a younger man, Ronald Sabatos, was made Manager of the Product Design and Application Department. Although no cut in his pay was made, Calhoun was demoted to Supervisor of the Department. Thereafter, Calhoun was not invited to participate in a training seminar to which both his immediate superior and junior were invited. Next, Calhoun was told that it was "grounds for dismissal" for him to have brought a portable television into work on Patriot's Day [1], a day that was a holiday for all nonsupervisory personnel, and watched the start and finish of the Boston Marathon, although similar conduct had occurred in the past without comment.

On May 20, 1982, Calhoun had a second meeting with Preuss concerning his retirement plans, as did all other employees eligi-

---

1. Patriot's Day is an indigenous Massachusetts holiday; the Boston Marathon is traditionally run on Patriot's Day.

ble for early retirement. Once again, Calhoun stated that he intended to keep on working. Calhoun had a third meeting with Preuss on August 30, 1982, as did all other retirement-eligible employees. The details of this meeting are in dispute as are other relevant facts.

Calhoun claims that Preuss told him at this meeting that the company was "ready to give him his severance pay and terminate him," albeit with full retirement benefits. The alternative offered by Preuss was that Calhoun would have to be prepared to work a twelve- to fourteen-hour day and Saturdays, as compared to the nine- and nine and one-half-hour day he had been working. Calhoun testified that no one at his level of management had worked such long hours. He also testified that in 1983, after his termination, he had a conversation with his former assistant who told Calhoun that he was not working any longer hours than Calhoun had worked. Preuss testified that Sabatos, the newly hired Product Design Manager, had been working twelve to fourteen hours a day. Preuss also testified that during this August conversation all he did was tell Calhoun about a "new" retirement package that the company had authorized allowing severance for early retirees. Company documents offered by Calhoun, however, indicated that the severance pay provision had been in effect since August of 1981, prior to Calhoun's first meeting with Preuss. Preuss testified that he was unaware of the policy prior to the August 1982 meeting. He also testified that he did not mention any specific number of hours that Calhoun would have to work, but said only that if Calhoun did not choose to retire he would be expected to work the same number of hours as those working under him and possibly some Saturdays. Both Preuss and Calhoun agreed that Calhoun asked Preuss at this meeting whether he could collect unemployment benefits while he was receiving severance pay.

The day after the August 30 meeting, Calhoun told Preuss that he would take early retirement. After leaving The Cleveland Twist Drill Company, where he had been making $34,000 a year with generous benefits, Calhoun sought similar work, but was unable to find it. He worked as a construction worker for $6 to $8 an hour and his income dropped to around $18,000 a year.

*Summary Judgment*

In his affidavit in opposition to the motion for summary judgment, Calhoun alleged that Preuss had asked him about his retirement plans three times in seven months, that he had been demoted and a younger man promoted to his position, that he had been threatened with a twelve- to fourteen-hour work day and Saturday work if he did not resign, and that he had been informed that no employee had been forced to work these hours after his termination. Appellants claim first that the district court should have struck those paragraphs of Calhoun's affidavit in which he claimed that after his resignation other employees had not worked the long hours he was threatened with because this information was not within Calhoun's personal knowledge. Without this assertion, appellants claim that the events alleged by Calhoun, even if shown to be true, were not sufficient as a matter of law to satisfy the plaintiff's summary judgment burden of proving constructive discharge.

Appellants rely on cases in which one of these factors standing alone was held an insufficient basis for a finding of constructive discharge: *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir.1977) (loss of prestige from job transfer insufficient); *Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983) (loss of prestige because of particularly precipitious replacement by trainee insufficient); *Vaughn v. Pool Offshore Co.*, 683 F.2d 922 (5th Cir.1982) (pranks, tricks, heavy-handed humor, and being required to work two consecutive hitches not sufficient).

■ Appellants' theory is that since each isolated incident cannot as a matter of law suffice for a constructive discharge, all of them together must also fail to do so. The fallacy in this "divide and conquer" ap-

proach is that these events must be viewed as part of a single behavior pattern by appellants. Even were we to omit the allegations concerning the hours worked by others after Calhoun was terminated, the other events taken together compare favorably enough with fact patterns in successful age discrimination cases so as to make a grant of summary judgment improper. *See Cockrell v. Boise Cascade Corp.*, 781 F.2d 173 (10th Cir.1986) (choice of transfer to lower paying job or resignation sufficient); *Williams v. Caterpillar Tractor Co.*, 770 F.2d 47 (6th Cir.1985) (demotion without warning or reprimand enough); *Buckley v. Hospital Corporation of America, Inc.*, 758 F.2d 1525 (11th Cir. 1985) (several inquiries about retirement plans along with humiliating demotion, even with same pay and benefits, sufficient). In this case, there were repeated inquiries about resignation, demotion of the plaintiff, promotion of a younger person and the threat of onerous working hours if no resignation. We cannot say as a matter of law that these events viewed as a whole could not be sufficient to constitute constructive discharge.

*Directed Verdict*

■ When deciding whether to grant a directed verdict motion, the trial court must look at the facts in a light most favorable to the nonmoving party and, if any set of facts could result in that party's victory, the court must deny the motion. "In doing so, we must recognize that it is for jurors, not judges, to weigh the evidence and determine the credibility of witnesses." *Insurance Co. of North America v. Musa*, 785 F.2d 370, 372 (1st Cir. 1986). The facts viewed in the light most favorable to Calhoun are:

1. Calhoun always received good work ratings and high pay raises until Preuss arrived;

2. Cleveland Twist Drill wanted to reduce its work force, preferably by retiring older employees;

3. Calhoun was asked three times in seven months whether he wished to retire, despite having made it clear the first time that he would not retire until he was sixty-five;

4. In an effort to remove Calhoun after he refused to retire, he was demoted, reprimanded for doing something he had done before without sanction, excluded from training sessions, and threatened with a drastic increase in working hours;

5. Calhoun was demoted from being in charge of the department he had run for fourteen years and was put under two people he had trained;

6. No specific criticism of Calhoun's work was ever made; and

7. After his termination, Calhoun was told by a former assistant who had taken over Calhoun's duties that he was not working any more hours than he ever had.

This set of facts was clearly sufficient for a jury to find that a reasonable person in Calhoun's shoes would have felt that his services were no longer desired.

*Judgment N.O.V.*

We have stated that

[t]he standard for granting judgment n.o.v. in this circuit is well settled. Such a motion should only be granted upon a determination that the evidence could lead reasonable [persons] ... to but one conclusion, a determination made without evaluating the credibility of witnesses or the weight of the evidence at trial.

*Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199 (1st Cir.1980). The testimony of Sabatos was to the effect that he had more formal engineering education than Calhoun, that he had some special expertise in a new product line being produced at the plant and that he generally worked a twelve- to fourteen-hour day. Cross-examination brought out that Sabatos' expertise was in a product that accounted for no more than 10–20% of the factory's output. Calhoun's expertise, on the other hand, related to the product that accounted for 80–90% of the factory's output. Sabatos also testified that Combis, the man who told Calhoun he was working the same

hours as before, had essentially taken over Calhoun's duties. Preuss' testimony focused upon the difficult financial position of the factory and his attempts to improve it. He testified that the company had less work than the staffing level could justify and that his first move was to reduce the staff. He also testified that the plant was having problems producing a quality product on time and that he thought Sabatos was simply a better man for the job. Cross-examination brought out that manufacturing deadlines did not fall within Calhoun's department, but within the responsibility of the Production Department. Preuss also testified that he did not want Calhoun to leave, but was simply trying to find out if he had any retirement plans before laying off a more junior employee.

▇ While appellants' explanation of their action is credible, a reasonable jury could have found that the facts amounted to a constructive discharge. Appellants offered very little evidence to justify Calhoun's demotion as the result of inadequate performance and the repeated retirement inquiries could be interpreted as harassment or at least a broad hint that Calhoun should retire, especially since he had expressed a clear intention not to retire at earlier meetings. Finally, the threat of an increased work day could be seen as a clear message that the company was prepared to make Calhoun's life more and more miserable as he continued to refuse to retire, especially when there was no evidence offered to show that Calhoun had to work long hours to get his job done. The district court did not err in denying appellants' motion for a judgment n.o.v.

▇ Appellants' final claim of error is the district court's failure to give an "anticorporate bias" jury instruction. Appel-

lants submitted such an instruction [2] to the court prior to the charge and properly objected to the court's failure to so instruct. Appellants argue that such an instruction was made necessary by the anticorporate language used by plaintiff's counsel during the closing: "they squeeze the corporate claws around his neck until he has no choice but to say, 'Well, I will retire,'" and "[s]lowly, Bob Calhoun could feel the claw of the company clutching at his neck." The district court instructed the jury that "[b]ias, prejudice, preconceived notions have no place in a jury's deliberations" and "[y]ou are to perform your duty without any bias or prejudice as to either party."

▇ "The purpose of jury instructions is to advise the jury on the proper legal standards to be applied in determining issues of fact as to the case before them." *Harrington v. United States*, 504 F.2d 1306, 1317 (1st Cir.1974). Beyond that, the district court's choice of jury instructions is a matter of discretion. We see no abuse of discretion in the district court's decision not to give the requested instruction. The court admonished the jury twice to avoid bias or prejudice and we believe that was sufficient under the circumstances. Plaintiff's metaphorical-alliterative reference to "corporate claws" seems to us to be within the normal bounds of creative advocacy. It did not approach the appeal to bias found in *Foster v. Crawford Shipping Co.*, 496 F.2d 788 (3d Cir.1974), where plaintiff's counsel emphasized that the corporation was foreign, it had substantial assets and the plaintiff would be a ward of the state if no award was made.

*Affirmed.*

---

**2.** The instruction requested by the appellants was as follows:

You should not attach any significance to the fact that Mr. Calhoun is an individual while Acme Cleveland and Cleveland Twist Drill are corporations. This case should be considered and decided by you as a case between persons of equal standing in the community. Corporations such as Acme Cleveland and Cleveland Twist Drill are entitled to the same fair trial at

your hands as a private individual such as Mr. Calhoun. You should not give any preference to Mr. Calhoun because he is an individual, nor does the mere fact that Mr. Calhoun is an individual make his testimony any more credible than the testimony presented by Acme Cleveland and Cleveland Twist Drill. All persons, including corporations, stand equal before the law and are to be treated as equals in a court of justice.