Diane **MARLEY**

v.

**UNITED PARCEL SERVICE, INC.**

Civ. A. No. 85–0789 P.

United States District Court, D. Rhode Island.

July 14, 1987.

---

Mitchell S. Rifkin, Providence, R.I., for plaintiff.

Christopher H. Little, Providence, R.I., for defendant.

OPINION AND ORDER

PETTINE, Senior District Judge.

The plaintiff, Diane Marley, brought this sex discrimination suit alleging violations of the Rhode Island Fair Employment Practices Act, R.I.Gen.Laws § 28–5–1 *et seq.* (1986). The plaintiff contends that the defendant, her former employer United Parcel Service, Inc. (UPS), discriminated against her in the terms, conditions, and privileges of her employment. Ms. Marley specifically alleges that the defendant discriminated against her with respect to her job assignments, working hours, and evaluation procedures. The plaintiff also alleges a campaign of demeaning conduct on the part of her immediate supervisor, Raymond Aubin.

Pursuant to the Rhode Island Fair Employment Practices Act, the plaintiff has requested that this Court declare unlawful and permanently enjoin the defendant from engaging in the allegedly discriminatory practices of which the plaintiff has complained and that this Court order the defendant to modify its employment policies and practices to conform to the mandates of the law. The plaintiff further seeks reinstatement to the position she would now hold at UPS but for the alleged discrimination of the defendant and she seeks recompense for her loss of earnings and benefits. Ms. Marley has also requested an award of attorney's fees and costs.

The plaintiff originally filed suit in Rhode Island Superior Court. The defendant successfully petitioned for removal of the action to federal court pursuant to 28 U.S.C. § 1446 (1982), basing jurisdiction upon the diversity of the parties. This case was tried to the Court on December 15–18, 1986. At the close of the plaintiff's case, the defendant moved for involuntary dis-

missal pursuant to Fed.R.Civ.P. 41(b). The Court deferred ruling on the motion until the close of all the evidence; this opinion represents the final resolution of the litigated issues as well as the motion for dismissal.

## I. FACTUAL FINDINGS

United Parcel Service is a package-delivery company with international operations. UPS coordinates its Rhode Island deliveries through a distribution center in Warwick, Rhode Island, where packages bound for Rhode Island destinations are sorted and loaded onto UPS's trademark brown delivery trucks for local delivery.

Diane Marley worked at UPS's Warwick facility from 1977 until January 1985. Ms. Marley worked almost exclusively as a part-time employee on the preload shift. The preload shift usually operated from 10 p.m. until 8 a.m. and its central functions were to unload incoming packages, to sort them by geographic area, and to load the sorted packages onto the delivery trucks before the drivers reported to work at approximately 8:30 in the morning.

The work areas in the Warwick facility are divided according to job function. In the "primary" area, hourly employees unload the tractor-trailer trucks carrying packages for the Warwick facility and sort the packages into one of four groups by geographic area. The sorted packages are placed on the appropriate conveyor belt to carry them to the "slides." The slides, as the name indicates, are essentially large chutes down which the packages slide from the conveyor belts to the "boxlines," revolving carousels of color-coded cages. Along the slide, six or seven boxline sorters sort the packages by destination and place them into the color-coded cages. Each cage represents a delivery truck awaiting loading. On the boxline, several "preloaders" remove the packages from the color-coded cages and load them onto the appropriate delivery trucks.

The Warwick facility housed three boxlines: the North, South and Metro boxlines. The North boxline prepared the trucks to deliver packages destined for the area of Rhode Island located north of Warwick; the South Boxline covered Warwick and the area to its south; the Metro boxline handled deliveries to Providence and its eastern environs. Along with the three boxlines, UPS operated an additional sorting and loading area known as the Red Belt. The Red Belt normally handled any package overflow from the boxlines, and during the peak Christmas season, handled package delivery to eastern Rhode Island.

UPS employed six supervisors to oversee the proper operation of the preload shift. The two primary supervisors oversaw the operation of the initial unloading of the packages; the rewrap and damages supervisor managed the handling and rewrapping of damaged packages; the slide supervisor was responsible for the smooth flow of packages through the slides; one supervisor was assigned to each boxline. The supervisors reported to the center manager who oversaw the running of the preload shift; the center manager, in turn, reported to the division manager who supervised the entire operation of the Warwick facility.

UPS employed approximately three hundred individuals at the Warwick facility. David Gelsomini, the former division manager, stated in deposition testimony, that at the time of Ms. Marley's employment, men and women were not equally represented in the Warwick facility, and that only one woman, Diane Marley, had achieved the rank of supervisor.

Diane Marley began her employment at UPS in 1977, working as an unloader in the primary area. Ms. Marley held this position for two years, at which time she was transferred to the North boxline as a secondary sorter. After approximately one year, Ms. Marley was promoted to a supervisory position on a part-time shift operating between 10 p.m. and 2 a.m. This shift ceased operations in January 1981 because of a decline in package volume normally experienced after the holiday season, and Ms. Marley was thereafter assigned to the position of part-time slide supervisor. During 1981, Ms. Marley was reassigned to the position of part-time supervisor of the Metro boxline.

In November 1981, Diane Marley left UPS for her first maternity leave. She returned to her former position as Metro boxline supervisor in February 1982.

During the period that Ms. Marley worked as a Metro boxline supervisor, she had numerous dealings with Raymond Aubin, the center manager for daytime package delivery from 1981–1983. Mr. Aubin's and Ms. Marley's work hours overlapped by approximately one hour in the morning and Ms. Marley often advised Mr. Aubin of any problems or changes on the preload shift which might affect the smooth operation of daytime package delivery. Mr. Aubin often informed Ms. Marley as well as her superiors, Brian Parmenter, the center manager of the preload shift, and Mark Stewart, the division manager, of any delivery problems he encountered which he felt were attributable to the performance of the preload shift.

Ms. Marley's encounters with Mr. Aubin were not without incident. Mr. Aubin admitted that he had several problems with Ms. Marley during this period, but he testified that he experienced similar problems with the other preload supervisors as well. However, Richard Meegan, a former UPS employee, testified that, in 1981, Mr. Aubin told him that he did not like Ms. Marley and he wanted Mr. Meegan to replace her as boxline supervisor. At that time, Mr. Meegan worked as a preloader on the Metro boxline; he was later promoted to the position of South boxline supervisor.

During this period of employment as Metro boxline supervisor, Ms. Marley sought to avoid conflict with Mr. Aubin by asking her center manager to explain the precise nature of Mr. Aubin's complaints so she could correct her performance accordingly. Apparently, her efforts did not succeed in quelling Mr. Aubin's complaints, because in early 1983 Ms. Marley requested a transfer from the Metro boxline to avoid any further conflict with Mr. Aubin. In response to her request, Brian Parmenter transferred Ms. Marley to the primary unload area and shortly thereafter he re-transferred her to the position of slide supervisor. The plaintiff testified that dur-ing this time, Mr. Aubin alone complained about the adequacy of her performance. Ms. Marley remained a slide supervisor until August 15, 1983, the date upon which she left UPS for her second maternity leave.

Immediately prior to her departure, Ms. Marley learned that Brian Parmenter was leaving his position as center manager of the preload shift to be replaced by Raymond Aubin. Mr. Aubin assumed this position on August 15, 1983, the day Mrs. Marley began her maternity leave, although Ms. Marley's absence from UPS was not enough to stop Mr. Aubin's expressions of apparent dislike for her. Mr. Meegan testified that sometime in August 1983, Mr. Aubin asked him who usually ran the preload shift in Brian Parmenter's absence. Mr. Meegan responded that Diane Marley usually ran the shift in Mr. Parmenter's absence, to which Mr. Aubin replied, "They must have had something going on the side," for the former center manager to have entrusted Ms. Marley with this responsibility. Although Mr. Aubin attributed this statement to Mr. Meegan, I find this denial to lack credibility.

Mr. Meegan also testified that during Ms. Marley's absence, Mr. Aubin routinely referred to the preload supervisors using the name "Marley" in a derogatory context. Mr. Meegan stated that Mr. Aubin often referred to him as "Rick Marley" after he had made a mistake in the course of his work; Mr. Meegan further testified that Mr. Aubin often referred to the other supervisors in the same manner. Mr. Aubin denied that he used the name "Marley" to criticize the other supervisors, and his testimony was buttressed by Joseph D'Arpino, the slide supervisor at that time, who testified that he never heard Mr. Aubin refer to other supervisors this way. However, Mr. Aubin admitted that on one occasion he paged Ed Sutcliffe, the damage and rewrap supervisor, over the facility's loudspeaker system as "Ed Marley." Mr. Aubin attributed his use of this appellation to benign error on his part, although he admitted that he was not certain whether this happened more than once and that he could not recall how many times he might have

addressed his supervisors as "Marley." Mr. Aubin's testimony supports the conclusion that this, in fact, happened more than once and possibly several times.

During the early part of his tenure as center manager of the preload shift, Mr. Aubin did not limit his demeaning comments to Ms. Marley. Mr. Meegan recalled an incident of August 1983 concerning a preloader named Marsha Arnold, who admitted at trial that she tended to cry when subjected to harsh criticism. Upon seeing Ms. Arnold in tears at the end of the Metro boxline, Mr. Meegan asked Mr. Aubin why Ms. Arnold was crying, and Mr. Aubin responded, "Goddamn girls, if they can't handle their jobs, why don't they just get out of here." Mr. Meegan testified that Mr. Aubin made several similar statements about Ms. Arnold between August 1983 and June 1984.

Ms. Marley returned to UPS on November 15, 1983. She was initially assigned to the daytime shift as an accommodation to her parenting obligations, but after one month, she resumed her duties as a slide supervisor. Several months later, in the late winter of 1984, the plaintiff was reassigned to the position of part-time supervisor of the Metro boxline, a position she held until her resignation from UPS on January 7, 1985. The crux of the plaintiff's complaint concerns events occurring during this time period.

On June 7, 1984, Diane Marley, Richard Meegan (the South boxline supervisor) and Gary Jennings (the North boxline supervisor) met with Raymond Aubin in the preload office where the preload supervisors often completed their paperwork and made telephone calls. Mr. Meegan asked Mr. Aubin why he could work all night with Gary Jennings but he could not work with Ms. Marley. Mr. Meegan and Ms. Marley both testified that Mr. Aubin responded, "Because you're male and she's female," and alluded to the fact that other employees would talk about them. Mr. Meegan responded that the only person talking about them was Mr. Aubin, and he questioned Mr. Aubin about a statement he had made at the monthly managers' meeting in

January 1984. According to Mr. Meegan, the participants at the January meeting were casually discussing a lawsuit in New Jersey stemming from the romantic involvement of a UPS manager and his secretary. According to Mr. Meegan, Mr. Aubin commented, "Never mind a secretary, I have two supervisors I have to watch," a statement Mr. Meegan understood to be a reference to himself and Ms. Marley. According to Mr. Meegan and Ms. Marley, Mr. Aubin admitted that he had been speaking of them. Mr. Meegan and Ms. Marley also testified that Mr. Aubin admitted using the name "Marley" as a synonym for error during Ms. Marley's maternity leave. Mr. Meegan further testified that sometime during 1984, Mr. Aubin told Mr. Meegan to stay away from Ms. Marley because their contact would give Ms. Marley "a reputation."

Ms. Marley testified that on August 14, 1984, she spoke with Raymond Aubin about her hours for the upcoming holiday season. Ms. Marley recalled the date because she had worked full time because of the Victory Day holiday, celebrated only in Rhode Island. Ms. Marley explained to Mr. Aubin that she anticipated having a problem getting to work at the usual starting time of 11:00 p.m. because her husband did not return home until then and she did not have a babysitter. Ms. Marley testified that Mr. Aubin responded "You're right. You do have a problem," and refused any accommodation in hours. During the 1984 Christmas season, Ms. Marley began work at 11 p.m. and worked until 8:30 a.m. or longer.

Although Ms. Marley was denied accommodation in her hours, there was evidence that two male supervisors, Mike Porcaro and Al Sheahan (both primary supervisors) requested and received adjustments in their hours to enable one to attend school and the other to fulfill his obligations to a second job. Mr. Aubin testified that he did not excuse Mr. Porcaro and Mr. Sheahan from working their full hours during the peak holiday season, although he did allow Mr. Sheahan to leave early if his job was finished, or to make up time on another shift if he missed a shift for his other job.

Mr. Porcaro testified that he never requested an accommodation in his hours, and that he worked the same hours as the other supervisors, but that he was excused from the additional duty of delivering packages in his own automobile if the truck carrying packages for Next-Day Air delivery arrived too late for loading onto the usual delivery trucks. As Mr. Aubin testified, this need arose two to three times per week during peak season. Mr. Aubin admitted on direct and cross-examination that, at their request, he afforded both Mr. Porcaro and Mr. Sheahan adjustments, but not reductions, in their hours of work in order to accommodate their competing time demands.

In October 1984, Ms. Marley began to document her encounters with Mr. Aubin. Ms. Marley's notes, made immediately or shortly after the events they describe, were entered into evidence at trial to document a series of events culminating in Ms. Marley's resignation from UPS on January 7, 1985.

On October 15, 1984, Mr. Aubin conducted Ms. Marley's formal performance review for the third quarter of 1984. The quarterly performance review involves evaluation of the employee's performance according to several categories of evaluative criteria set forth on the employee's Management Development Performance Appraisal form. The quarterly evaluation requires both an objective and subjective appraisal of the employee's performance. The objective portion of the evaluation measures the employee's performance in terms of the percentage of predetermined performance goals the employee has attained in several categories of job objectives. The subjective portion is the manager's appraisal of the employee's personal qualities and managerial skills. In addition to the quarterly performance ratings, the performance appraisal requires the manager to assign a numerical rating on an ascending scale of zero to six to the employee's objective performance at the end of each six and twelve-month period. The numerical rating corresponds to an overall effectiveness percentage calculated as part of the employee's objective evaluation.

The overall percentage is obtained by averaging the percentage of effectiveness attained in each performance category. Thus, an employee who attains one hundred percent performance in meeting his or her job objectives would receive an overall effectiveness percentage of one hundred percent, and would receive a numerical rating of six.

During her third-quarter review, Ms. Marley noticed that someone had changed her six-month numerical rating from a five to a three and had rated her performance as unacceptable. When confronted with the appraisal change, Mr. Aubin suggested that the rating must have been too high and that someone must have changed it. Ms. Marley refused to sign the evaluation for the third quarter until she received an adequate explanation for the change in the six-month numerical rating. Consequently, she and Mr. Aubin met with the division manager, David Gelsomini, to discuss the problem.

Although Mr. Aubin had initially denied changing Ms. Marley's effectiveness rating, upon entering Mr. Gelsomini's office, Mr. Aubin stated that he had rated some of the supervisors too high and he had reevaluated them accordingly. Ms. Marley explained that the change had been made without her knowledge and consent after she had signed the form, an act for which Mr. Gelsomini reprimanded Mr. Aubin. Mr. Aubin explained at trial that he had rated his supervisors subjectively in assigning them six-month numerical ratings, and he recalculated the number upon realizing that the rating should have been based entirely upon the objectively measured performance criteria.

Mr. Aubin's explanation does not withstand critical scrutiny. In deposition testimony, Mr. Aubin testified that his error resulted from a lack of familiarity with the Management Development Performance Appraisal form and that he had probably only used the form twice before. At trial, he admitted familiarity with the form since 1981, the year the particular form came into use at UPS.

Mr. Aubin testified that he also amended the numerical ratings on the evaluations of Ed Sutcliffe (the rewrap and damages supervisor) and Gary Jennings (the North boxline supervisor), however, Mr. Aubin's contention is contradicted by visual examination of the supervisors' evaluation forms. Although the numerical rating should have been based on an overall percentage of effectiveness, only Ms. Marley's evaluation form bears such a calculation. One would have expected to see a similar calculation on Mr. Sutcliffe's and Mr. Jennings' evaluations if Mr. Aubin had changed them along with Ms. Marley's. Moreover, even if Mr. Aubin did change Mr. Jennings' and Mr. Sutcliffe's ratings, an independent calculation of the supervisors' overall percentages reveals a significant discrepancy between the effectiveness percentages attained and the numerical ratings Mr. Aubin awarded. Richard Meegan received a numerical of 5 although his overall percentage of effectiveness was 11%; Gary Jennings received a numerical rating of 3 with 17% effectiveness; Michael Porcaro received a 4 with 64% effectiveness; Ed Sutcliffe received a 3 with 33% effectiveness; Ms. Marley received a 3 with 35% effectiveness. These figures clearly indicate that Mr. Aubin evaluated the preload supervisors in a purely random, subjective manner which, according to the testimony of the District Personnel Manager, Joseph Ferro, violated UPS policy. Indeed, although Mr. Ferro testified that it was within the province of each division to establish the range of effectiveness percentages which would correspond to a particular numerical rating, neither Mr. Aubin nor Mr. Gelsomini could testify with any specificity as to the ratings criteria in use at the Warwick facility. Ms. Marley testified that she had always received numerical ratings of four or five prior to the second quarter of 1984.

During 1984, Diane Marley served as a member of the Service Awareness Committee, an organization composed primarily of UPS supervisors whose central purpose was to target, monitor and correct UPS's service problems. David Gelsomini, the division manager, appointed the members of the Service Awareness Committee, and he was sufficiently impressed with Ms. Marley's participation in the 1984 Committee and with her managerial potential that, in October 1984, he asked her to serve as the Committee's chairperson for the coming year. As the Committee Chairperson, it was Ms. Marley's job to run the Committee meetings as well as to attend an annual meeting at the district headquarters in Hartford, Connecticut to report on her Committee's work.

On November 2, 1984, at the monthly managers' meeting at Valle's Steak House, Mr. Gelsomini asked Ms. Marley to begin the Service Awareness Committee meeting while he went to make a phonecall in another part of the restaurant. Approximately thirty managers and supervisors were in attendance. Ms. Marley began the meeting by assigning the supervisors certain aspects of UPS service upon which they would report to the Committee. Ms. Marley assigned Ed Sutcliffe to monitor and report on damages since it coincided with his job as rewrap and damages supervisor. Although Ms. Marley testified that she had told Mr. Aubin that she wanted Ed Sutcliffe to report on damages, the news apparently came as a surprise to him since he leaped from his seat yelling, "That's bullshit. You can't do that, that's bullshit." Mr. Aubin testified that he had spent a considerable amount of time preparing a report on damages, and he was angry that Ms. Marley had changed the assignment without consulting him.

Finding herself unable to pacify Mr. Aubin's anger and to bring an end to his humiliating tirade, Ms. Marley left the room after several minutes to seek Mr. Gelsomini's assistance. Ms. Marley informed Mr. Gelsomini that she could not serve as the Chairperson of the Committee while Mr. Aubin was a member, at which point Mr. Aubin appeared and continued to upbraid Ms. Marley. Mr. Gelsomini and Ms. Marley resolved to discuss the problem the following Monday, however, Ms. Marley decided that it was best for her to resign from the Committee in order to avoid any further discord with Mr. Aubin.

Ms. Marley confirmed her decision with Mr. Gelsomini on November 6 and 7, 1984.

On November 5, 1984, Ms. Marley sought Mr. Meegan's assistance on her line because a new preloader was having difficulty loading his assigned trucks. Before his promotion to supervisor, Mr. Meegan had loaded the trucks assigned to the new preloader and Ms. Marley thought that Mr. Meegan's assistance would hasten the loading process and would help the preloader learn his job more quickly. Mr. Meegan helped Ms. Marley for twenty-two minutes, that is, for one revolution of the boxline. During this twenty-two minute interval, Ms. Marley observed Mr. Aubin walking on the second-story conveyor belt watching her and Mr. Meegan. Mr. Aubin was stepping over packages and staying in the same spot above the boxline. Ms. Marley testified that she had never observed anyone on those conveyor belts except to break up jams. According to Mr. Meegan, Mr. Aubin later told him that he should not work with Ms. Marley even if all of her subordinates failed to report for work. Mr. Meegan was allowed to help the other supervisors, indeed, several days later, Mr. Aubin asked Mr. Meegan to help Gary Jennings on the North boxline.

On November 15, 1984, five preload supervisors, Gary Jennings, Rick Meegan, Ed Sutcliffe, Joe D'Arpino and Diane Marley met with Mr. Aubin in his office to discuss their dissatisfaction with the hours worked by the primary supervisors, Mike Porcaro and Al Sheahan. Mike Porcaro worked from 10 p.m. to 7 a.m., while Al Sheahan worked from 1 a.m. to 10 a.m., although the operations of the primary ended at 7—7:30 a.m. Half an hour after this initial discussion, Mr. Aubin summoned the five supervisors back to his office and indicated that all the supervisors worked the same number of hours. Several supervisors commented that they would prefer to begin work at 1 a.m. with Mr. Sheahan; Ms. Marley then inquired as to why Mr. Sheahan did not report until after the start of his shift. Mr. Aubin responded that he alone set the hours for the preload shift, and he noted that Mike Porcaro needed to attend school during the day. Ms. Marley suggested that they all had daytime obligations.

Although the preload supervisors were required to work only until 8:30 a.m., apparently they often stayed later to complete their responsibilities. Mr. Aubin commented that there was no reason for the boxline supervisors to be staying later than their scheduled finish time, however, Ms. Marley explained that the boxline supervisors needed to stay until all the drivers left in order to ensure that the drivers did not deposit any packages into the boxline for which the boxline supervisors would be held accountable. Mr. Aubin stated his perception that the supervisors were accusing him of favoritism and he pointed out that the supervisors had all made accommodations for their subordinates when needed. Ms. Marley inquired as to why she had not received an accommodation (referring to her August request), to which Mr. Aubin responded that if she could not handle her job, she should find a career counselor to help her find a new one.

Later that morning, Mr. Aubin informed the preload supervisors that they were to meet in David Gelsomini's office at 9:00 a.m. At this meeting Mr. Gelsomini distributed bonus checks and told them that Raymond Aubin ran the preload shift and if they did not like it they were free to quit. Mr. Gelsomini pointed to Mr. Meegan and stated that he was not the spokesman for the supervisors and if he did not stop "screwing around" he would be terminated. Mr. Gelsomini then pointed to Ms. Marley and told her to stop spreading vicious lies and rumors and to stop causing dissention and "screwing around" or she, too, would be fired. Although Mr. Gelsomini contends that the meeting took place on December 6, 1984, and he denies using the words "screwing around", Mr. Gelsomini's recollection of these events coincides with Mr. Meegan's and Ms. Marley's testimony.

On December 17, 1984, one of the Metro slide sorters called in sick, and according to Mr. Aubin, he had no extra personnel with which to replace him. Mr. Aubin informed Ms. Marley that she would have to sort packages all night. Later that evening,

Richard Meegan borrowed a slide sorter to help him break a jam on his slide, thus leaving Joe D'Arpino, the slide supervisor, to sort packages for the Red Belt for about an hour. Mr. Aubin instructed Mr. Meegan to return the sorter to Mr. D'Arpino because supervisors were not required to perform physical labor. Meanwhile, Ms. Marley continued to sort packages as Mr. Aubin had instructed.

On January 2, 1985, Mr. Aubin met with Ms. Marley to discuss job reassignments for the coming year. Mr. Aubin had intended to reassign the supervisors to make room for the promotion of a North boxline hourly employer, Tom McGovern. Mr. Aubin testified that he had intended to move Ms. Marley to the North boxline to cure productivity problems on that line and to replace Ms. Marley with Tom McGovern. Mr. Aubin did not want Mr. McGovern to supervise the North boxline because he would be in the unenviable position of supervising his former coworkers.

Ms. Marley testified that Mr. Aubin told her she was to be assigned to the position of slide supervisor, and that Ed Sutcliffe would be reassigned from the slide to the South boxline to replace the recently terminated Rick Meegan. Tom McGovern was to replace Ms. Marley on the Metro boxline. Ms. Marley viewed this reassignment as a humiliating demotion; she responded by tendering her resignation on January 7, 1985. Ms. Marley wrote to Raymond Aubin:

> Please let it be documented that I am giving my two week notice and resigning as a supervisor for the United Parcel Service.
>
> I have thought long and hard and found I have no alternative but to leave. The lack of communication, teamwork and trust are just a few reasons I find it necessary to resign. Incidences of favoritism and unfair practices have become intolerable. I feel I can no longer develop as a person or manager. I am being replaced from the Metro boxline although my operation has shown steady improvement yet the North boxline has

failed to improve and that supervisor remains.

> I have always considered my employment at United Parcel Service to be my career, but as I near my eighth anniversary date I see that my hands are tied and can no longer stay in such a hostile environment.
>
> I must succumb to the pressure to resign.

Ms. Marley handed her letter of resignation to Raymond Aubin, who told her only that she did not have to quit. When informed of Ms. Marley's resignation Mr. Gelsomini responded that Ms. Marley was not required to give two weeks' notice of her resignation and that she could leave immediately. Mr. Aubin conveyed this message to Ms. Marley, who left UPS that day. Neither Mr. Aubin nor Mr. Gelsomini took further action with regard to Ms. Marley's resignation. Joseph Ferro, the district personnel manager, conducted an exit interview with Ms. Marley after her departure; no action was taken in response to Ms. Marley's grievances.

It should be noted that Ms. Marley's performance is not at issue in this case. Ms. Marley was among the highest-paid supervisors at UPS and UPS concedes that Ms. Marley was an effective, productive employee who possessed managerial skills indicative of leadership potential. With these findings of fact in mind, I turn to consider the applicable legal standards.

## II. APPLICABLE LAW

■ This state-law action is before this Court pursuant to the proper exercise of the Court's grant of diversity jurisdiction, consequently, the Court must look to the substantive law of Rhode Island for the proper resolution of the plaintiff's claim. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Rhode Island Fair Employment Practices Act provides that it is an unlawful employment practice:

(1) For any employer:

(A) to refuse to hire any applicant for employment because of his race or col-

or, religion, sex, handicap, age, or country of ancestral origin, or

(B) Because of such reasons, to discharge an employee or discriminate against him with respect to hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment. . . .

R.I.Gen. Laws § 28-5-7 (1986)

Upon determining that an employer has committed an unlawful employment practice, the Rhode Island Commission for Human Rights is empowered by the statute's remedial provision to

state its findings of fact and ... issue and cause to be served on the respondent an order requiring the respondent to cease and desist from such unlawful employment practices, and to take such further affirmative or other action as will effectuate the purposes of this chapter, including but not limited to hiring, reinstatement, or upgrading of employees with or without back pay. . . .

R.I.Gen. Laws § 28-5-24 (1986).

Because the Rhode Island Fair Employment Practices Act is nearly identical in its remedial provision to its federal analog, Title VII,[1] the Rhode Island Supreme Court has applied the analytical framework developed in federal Title VII cases to actions brought pursuant to the Rhode Island statute. *See Newport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights,* — R.I. —, 484 A.2d 893, 897-98 (1984); *Narragansett Elec. Co. v. Rhode Island Comm'n for Human Rights,* 118 R.I. 457, 459, 374 A.2d 1022, 1023 (1977). Consequently, although Ms. Marley's action is founded upon the Rhode Island Fair Employment Practices Act, this case is governed by legal standards set forth in federal cases construing Title VII.

Title VII cases generally fall into one of two categories: disparate impact cases or disparate treatment cases. Disparate impact cases involve a challenge to a facially neutral employment practice that adversely and disproportionately affects employees of a protected class. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 529-30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). A disparate treatment claim generally involves allegations that an employer has discriminated against an employee of a protected class with respect to a term, condition or privilege of employment. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 796, 93 S.Ct. 1817, 1821, 36 L.Ed.2d 668 (1973). Ms. Marley has alleged a claim of disparate treatment.

Title VII also protects employees from discrimination that does not cause the employee to lose any tangible job benefit, but which nonetheless creates a psychologically damaging "hostile environment" at the workplace. In response to certain allegations made in Ms. Marley's memoranda of law and evidence presented at trial, the Court requested the parties to brief the question of whether Ms. Marley had stated a valid claim of a discriminatory, hostile environment. I turn first to Ms. Marley's claim of disparate treatment.

## III. DISPARATE TREATMENT

The standard of liability and burdens of proof governing the adjudication of Title VII claims alleging disparate treatment are well established. In any case of disparate treatment, it is the plaintiff's initial burden to prove the elements of a *prima facie* case of discrimination by a preponderance of the evidence. The elements of the plaintiff's *prima facie* case will vary according to the factual context of the discrimination alleged, but in the typical case of sex discrimination the plaintiff must demonstrate

---

**1.** The remedial provision of Title VII provides: If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropri-

ate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. 42 U.S.C. § 2000e-5(g) (1982).

that 1) she was a member of a protected class; 2) she was qualified for the position she held; 3) despite her qualifications the defendant terminated her employment; and 4) after her termination the defendant either left her position vacant or filled it with a man. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 & n. 6, 101 S.Ct. 1089 & n. 6, 67 L.Ed.2d 207 (1981); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824. Proof of the elements of the *prima facie* case creates a rebuttable presumption of discrimination, *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action at issue. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. At all times the burden remains with the plaintiff to prove the ultimate issue by a preponderance of the evidence, that is, whether the defendant intentionally discriminated against the plaintiff with respect to a term, condition or privilege of employment. *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

Ms. Marley voluntarily resigned her position at UPS, consequently, as an element of her *prima facie* case, she must demonstrate that her resignation, tendered in response to the proposed transfer to the position of slide supervisor, represented a constructive discharge on the part of her employer. "The constructive discharge doctrine applies when an employee has resigned his employment under such circumstances that his resignation is treated as a discharge for the purposes of proving a *prima facie* case of employment discrimination." *Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 925 (5th Cir.1982). UPS contests the adequacy of the proof of constructive discharge and upon this basis, moves for involuntary dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.

This Circuit has adopted an objective test for determining when an employee has been constructively discharged: "the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir.1986) (quoting *Aliceu Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)). This inquiry naturally focuses on the reasonable state of mind of the assumed discriminatee, *id.* and requires proof of more than the usual workplace stress.

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his coworkers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). As the First Circuit has stated, " 'An employee may not be unreasonably sensitive to his working environment.' Thus the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Calhoun,* 798 F.2d at 561 (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981)).

UPS does not contest Ms. Marley's status as a member of a protected class, her qualifications for the position she held, or that she was replaced by a man. However, UPS argues that by no stretch of the imagination was Ms. Marley's transfer to the position of slide supervisor a constructive discharge. UPS contends that Ms. Marley's transfer occurred in the ordinary course of business at UPS, and that such transfers were deemed beneficial both to the company and to the employee. UPS maintains that because Ms. Marley's hours,

salary, status as a supervisor and potential for future advancement would have been the same in either position, Ms. Marley cannot claim that she was constructively discharged.

■ Admittedly, this case does not present the "classic example" of a constructive discharge in which an employee is ordered to resign or face a certain termination. *See Burney v. City of Pawtucket,* 559 F.Supp. 1089, 1097 (D.R.I.1983), *aff'd in part, rev'd in part on other grounds,* 728 F.2d 547 (1984). Indeed, these facts present a very close case. However, it is my view that a reasonable person in Ms. Marley's position would have felt compelled to resign when faced with the proposed job transfer at issue here.

The positions of slide supervisor and boxline supervisor clearly entailed differing responsibilities. The essential function of the slide supervisor was to break up jams along the slides and to ensure the clear passage of packages to the boxline. The slide supervisor was responsible for the training and supervision of the eight or nine hourly employees who worked on the slides sorting packages. Mr. Aubin testified that the slide supervisor was also required to tabulate package volume although Ms. Marley testified that this responsibility existed on paper only.

Mr. Aubin's testimony clearly indicated that the boxline supervisors' responsibilities were, in part, largely coextensive with the duties of the slide supervisor. Mr. Aubin stated that as Metro boxline supervisor, Ms. Marley was responsible for the boxline as well as for the metro slide; that she was responsible for breaking jams on the metro slide if the slide supervisor was unavailable; and that Ms. Marley was authorized to instruct the sorters as to the changes in sorting procedures when the slide supervisor was otherwise occupied. Mr. Aubin also testified that it was the boxline supervisors' job to aid the cleaning of liquid spills on the slides, as well as to coordinate the delivery of "bulk loads," *i.e.,* large volumes of packages destined for single locations.

In addition to the responsibilities the boxline supervisors shared with the slide supervisor, the position of boxline supervisor entailed significant responsibilities of its own. The boxline supervisors were responsible for training and supervising twelve hourly production workers, and they were responsible for overseeing the daily loading (in Ms. Marley's case) of thirty-four UPS delivery trucks. It was the boxline supervisors' responsibility to make certain that the loads on each delivery truck were "level," that is, that each truck had approximately the same amount of delivery stops to make. It was also the boxline supervisors' job to keep accurate records and compile weekly reports on the number of stops per truck, the frequency of missorts on the boxlines, and the percentage of the delivery trucks not completely loaded and ready for the driver at the end of the preload shift. Mr. Aubin testified that it was the general responsibility of each boxline supervisor to facilitate the delivery of packages, and Mr. Aubin reprimanded Ms. Marley on several occasions for packages left in the slide or in the rewrap area, creating the legitimate inference that the boxline supervisor was ultimately responsible for ensuring that each package destined for delivery in his or her area was properly loaded onto the appropriate delivery truck.

The disparity in the amount and nature of the responsibilities assigned to the slide supervisor vis-a-vis the boxline supervisor certainly supports the conclusion that the slide supervisor occupied a position in many respects subordinate and inferior to that of the boxline supervisor and that a transfer from the boxline to the slides would entail, at least, a loss of job prestige. I recognize that a "limited blow to one's pride or prestige does not provide reason enough to resign during whatever period may be required to seek judicial or administrative relief. A more drastic reduction of working conditions is needed." *Alicea Rosado,* 562 F.2d at 119–20. However, I believe the injury to Ms. Marley goes well beyond the petty slights often experienced in a competitive work environment, and indeed constituted a constructive discharge.

Ms. Marley testified at trial that when Mr. Aubin informed her that she was to be transferred to the position of slide supervisor she felt humiliated. Although the transfer under normal circumstances might not have caused humiliation to a reasonable person in Ms. Marley's position, it must be remembered that Ms. Marley had already served as the slide supervisor for a substantial period of time in 1983 and 1984, thus, for Ms. Marley, such a transfer could reasonably be viewed as a humiliating demotion. As the First Circuit has stated:

> Humiliation usually justifies an unlawfully discharged employee's lack of mitigation efforts where the effort would involve almost daily face to face dealings with the alleged wrongdoer or where the nature of the substituted job is reasonably inferior to the prior position.

*Id.* at 120 n. 4.

As a slide supervisor, Ms. Marley would report directly to Mr. Aubin, thus she would continue to face daily contact with him even after transfer.

UPS seeks to justify Ms. Marley's assignment on the grounds that it was the usual practice for UPS to transfer employees to different positions within a given shift to expose them to the various facets of the particular operation. Joseph Ferro, the district personnel manager, testified that UPS believed that this practice enhanced the employee's value to the company and made him or her a more likely candidate for promotion. While a logical explanation for the transfer policy in general, Mr. Ferro's testimony cannot explain the value of Ms. Marley's transfer because she had already held the position of slide supervisor. Neither Ms. Marley's promotion potential nor her overall value to UPS was enhanced, indeed, it is reasonable to conclude that Ms. Marley's promotion potential would be diminished by spending time in a job which required less managerial skill than the position of boxline supervisor and whose challenges she had already mastered.

Mr. Aubin testified that he intended to transfer Ms. Marley to make room for the promotion of Tom McGovern, an hourly employee. Mr. McGovern worked on the North boxline and Mr. Aubin felt it would be best to promote him to the Metro boxline because it had the fewest production problems. Mr. Aubin also sought to avoid the difficult situation of forcing Mr. McGovern to supervise his former coworkers on the North boxline. Although Ms. Marley's transfer served a legitimate end in this regard, it cannot fully explain Ms. Marley's transfer to the slides as opposed to another supervisory position, and it thus evades the pivotal question of whether Ms. Marley's transfer may reasonably be viewed as a constructive discharge. The lack of credible testimony on Mr. Aubin's part tends to support the inference that it may.

As recounted in the factual findings, on January 2, 1985, Mr. Aubin met with several supervisors to discuss assignments for the coming year. Mr. Aubin testified that he did not tell Ms. Marley that she was to be transferred to the slides and that he actually intended to assign her to the North boxline. Ms. Marley testified that Mr. Aubin told them that Ed Sutcliffe, the slide supervisor, was to replace the recently terminated Richard Meegan on the South boxline and that Tom McGovern was to be promoted from an hourly position on the North boxline to the position of Metro boxline supervisor.

Mr. Aubin's testimony was undermined by certain obvious weaknesses. First, Mr. Aubin stated that he was not certain whether Tom McGovern had replaced Ms. Marley on the Metro boxline after her resignation. Mr. Aubin's hesitancy is suspect because he was responsible for the supervisors' assignments and clearly remembered the personnel changes he had made prior to Mr. McGovern's promotion. Mr. Aubin's statement that he intended to transfer Ms. Marley to the North boxline to cure its productivity problems was not supported by the evidence. Not only was Gary Jennings, the North boxline supervisor, not replaced, but he was promoted to the position of full-time supervisor sometime between 1985 and 1986, a fact which completely undermines Mr. Aubin's allegations of poor performance.

Mr. Aubin's lack of candor with respect to Ms. Marley's transfer is a strong indication that the reassignment was a *de facto* demotion and was intended as such. While evidence of Mr. Aubin's intent is not necessary to prove constructive discharge, it does tend to support the reasonableness of Ms. Marley's perception that the proposed transfer to the position of slide supervisor was an unacceptable degradation of her working conditions. Although UPS has argued that Ms. Marley's transfer from the Metro boxline to the slides in 1983 and her reassignment to the boxlines in 1984 demonstrates the common occurrence of these lateral transfers, UPS has ignored the fact that Ms. Marley requested the transfer in 1983 solely to escape Raymond Aubin's steady barrage of complaints to her supervisors.

It was also clear from the evidence that, by January 1985, Ms. Marley occupied a very tenuous position with UPS, and that any expression of dissatisfaction on her part would likely result in her termination. As Ms. Marley testified, by December 1984, she feared for her job, and the evidence supports the reasonable nature of her apprehensions. On two separate occasions prior to her resignation, Mr. Aubin had indicated to Ms. Marley that her employment existed on a "take it or leave it" basis only.

On August 14, 1984, Mr. Aubin refused to accommodate Ms. Marley's parenting obligations in setting the schedule for peak season hours. Mr. Aubin's response that Ms. Marley had a problem that he would not help her solve, exemplifies Mr. Aubin's attitude that if Ms. Marley could not live with the working conditions at UPS, her only choice was to leave. Mr. Aubin reiterated this position in the November 15, 1984, meeting with the supervisors in response to Ms. Marley's reminder that Mr. Aubin had refused to adjust her hours. Mr. Aubin's response that Ms. Marley should seek the help of a career counselor to obtain new employment if she was not satisfied with conditions at UPS is clear indication of Mr. Aubin's intransigent attitude. I also note that Mr. Aubin's surreptitious amendment of Ms. Marley's performance appraisal raises the legitimate inference that Mr. Aubin was paving the way for Ms. Marley's termination.

Joseph Ferro testified to an "open door" grievance procedure in effect at UPS during 1984 and 1985. The "open door" policy allowed an employee to move up the ladder of authority with any grievance until the grievance was resolved to the employee's satisfaction. Although Ms. Marley testified that she had no knowledge of the "open door" policy, it was apparent from the evidence that open doors were closed to Ms. Marley. David Gelsomini, the division manager, and highest-ranking UPS employee at the Warwick facility, had already informed Ms. Marley and the other supervisors on November 15, 1984, that if they did not agree with Mr. Aubin's management decisions, they were free to quit. While Mr. Gelsomini's comments do not constitute discrimination, it is clear that Ms. Marley was left without recourse when faced with Mr. Aubin's unfair assignment. For Ms. Marley, the "open door" led nowhere but out.

Viewing the evidence of constructive discharge "as part of a single behavior pattern" on the part of UPS, *see Calhoun*, 798 F.2d at 563, I conclude that UPS constructively discharged Ms. Marley and that she has proven a *prima facie* case of sex discrimination. UPS contends, however, that Ms. Marley cannot establish that she was the victim of disparate treatment.

As its articulation of a legitimate, non-discriminatory reason for its employment actions, UPS contends that the Warwick facility was often a palpably pressured, harsh environment where a premium was placed on timely and accurate performance and all employees were equally subject to criticism. In this respect, UPS contends that Ms. Marley was treated no differently than her male counterparts and she can claim no disparate treatment. Moreover, UPS contends that it has rebutted Ms. Marley's contentions through its witnesses' testimony, thus defeating her claim of intentional sex discrimination.

It is my view, and indeed, I find by a preponderance of the evidence, that Diane Marley was the victim of illegal sex discrimination. Her allegations detail a campaign of demeaning conduct on the part of Raymond Aubin for which I can find no legitimate justification. The evidence is clear that, despite the defendant's contention to the contrary, Diane Marley was not treated like her male counterparts.

Beginning with Ms. Marley's allegations that she was unfairly restricted to her work area and segregated from Mr. Meegan, UPS contends that Mr. Aubin's admonishments to Ms. Marley to stay in her work area were justified by Ms. Marley's behavior. To this end, the defendant offered the testimony of Marsha Arnold and Kathy Maguire, two hourly employees, who testified that Ms. Marley and Mr. Meegan spent an inordinate amount of time away from their designated work areas. While I credit the defendant's witnesses on this point, their testimony does not begin to explain Mr. Aubin's behavior with regard to Ms. Marley's relationships with her male coworkers.

First, Mr. Aubin's initial accusations regarding Ms. Marley's sexual conduct at work concerned her relationship with Mr. Aubin's predecessor and occurred while Ms. Marley was absent on maternity leave. Further, Mr. Aubin's comment that Mr. Meegan's presence around Ms. Marley would give her "a reputation" indicates that Mr. Aubin's concern extended beyond the question of his supervisors' job performances and had an unequal impact on Ms. Marley. Indeed, Mr. Aubin targeted Ms. Marley for this patronizing behavior, the perceived need for which Mr. Aubin largely created himself. Moreover, as indicated by the incident of November 5, 1984, in which Mr. Aubin prohibited Mr. Meegan from helping Ms. Marley, the final result of Mr. Aubin's suspicion was to place Ms. Marley in the disadvantageous position of being unable to seek the help of her male counterparts, although they were perfectly free to help one another.

Mr. Aubin's use of Ms. Marley's name as a synonym for inadequate job performance further supports Ms. Marley's allegations of discriminatory treatment, and Mr. Aubin's unrestrained, discourteous behavior at the Service Awareness Committee meeting exemplifies the lack of respect Mr. Aubin afforded Ms. Marley despite her position of authority on the Committee.

Mr. Aubin's discriminatory behavior affected more concrete terms of Ms. Marley's employment as well. As the testimony indicated, Mr. Aubin willingly adjusted Al Sheahan's and Mike Porcaro's working hours in response to their requests for schedule modifications although he refused a similar reduction for Ms. Marley. While UPS seeks to cast this preferential treatment as having an equal effect on the five remaining supervisors without regard to sex, I believe the more appropriate comparison is between the supervisors who sought and received schedule accomodations, namely Mr. Sheahan and Mr. Porcaro, and the one supervisor who sought, but was denied an accommodation, Diane Marley.

Mr. Aubin's dishonest and arbitrary evaluation of Ms. Marley's performance for the second quarter of 1984 reeks of the discrimination of which Ms. Marley complains. Mr. Aubin's feeble explanation for the erroneous application of the evaluation procedures deserves no credibility and his protestations of egalitarian results do not survive empirical scrutiny. Although UPS contends that Ms. Marley's poor evaluation had no effect on the terms, conditions or privileges of her employment, I find this argument to be utterly devoid of merit. Performance evaluations form the core determinant of the terms, conditions or privileges of employment and to discriminate in the evaluation of an employee's performance is to create a ready justification for the discriminatory degradation of those terms, conditions or privileges.

Finally, UPS has offered no legitimate explanation for Mr. Aubin's requirement that Ms. Marley sort packages all night while a male supervisor was instructed not to perform physical labor, nor has UPS offered an adequate explanation for Mr. Aubin's comment about Marsha Arnold, namely, that if the women employees could

not handle their jobs, they should leave UPS' employment. UPS also failed to offer any evidence to contradict Mr. Meegan's testimony that, as early as 1981, Mr. Aubin had expressed dislike for Ms. Marley and a desire that she be replaced. For these reasons, I find that Diane Marley has proven by a preponderance of the evidence that she was a victim of intentional sex discrimination in violation of the Rhode Island Fair Employment Practices Act.[2]

## IV. ORDER

The defendant, United Parcel Service, Inc. has intentionally discriminated against the plaintiff, Diane L. Marley, on the basis of her sex in violation of the Rhode Island Fair Employment Practices Act, R.I.Gen. Laws § 28-5-7 (1986).

I therefore permanently enjoin the defendant, United Parcel Service, Inc., its agents and employees from engaging in the unlawful employment practices complained of here, namely, discrimination against Diane Marley with respect to her job assignments, working hours and evaluation procedures.

I further order the defendant to reinstate Diane Marley to her former position of part-time preload supervisor of the Metro boxline at United Parcel Service's Warwick facility and to fully restore Ms. Marley's salary and benefits.

The defendant is also hereby ordered to pay Diane Marley the sum of $44,489.90, the amount of her lost earnings of $20,800 per year from January 15, 1985, through the date of final judgment offset by Ms. Marley's earnings in mitigation and bene-

fits received from the Rhode Island Department of Employment Security.

Finally, pursuant to R.I.Gen.Laws § 28-5-24 (1986), I hereby order that the plaintiff be awarded attorney's fees, to be determined after a hearing before this Court to review evidence and to make findings.

So ordered.

---

**2.** Because I have found in Ms. Marley's favor on her disparate treatment claim, I do not feel it is necessary to delve into her hostile environment claim. It suffices to say that Mr. Aubin's degrading comments about Ms. Marley's sexual activities would be fully actionable if "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Although UPS has argued that Mr. Aubin's behavior was not sexual harassment and thus not

cognizable under a hostile environment theory, I note that this kind of sex discrimination is not limited to sexual harassment but covers a range of discriminatory behavior. *See, e.g., Carroll v. Talman Federal Savings & Loan Ass'n,* 604 F.2d 1028, 1032-33 & n. 13 (7th Cir.1979), *cert. denied,* 455 U.S. 929, 100 S.Ct. 1316, 63 L.Ed.2d 762 (1980) (requiring female bank employees to wear uniforms while allowing male employees to choose their own attire violates Title VII by reinforcing demeaning sexual stereotypes; the court noted that "terms and conditions of employment" refers to more than tangible economic compensation and benefits).