Angelina M. WELLBORN

v.

**SPURWINK/RHODE ISLAND et al.**

No. 2004–183–Appeal.

Supreme Court of Rhode Island.

April 25, 2005.

Bruce P. Gladstein, Avon, for Plaintiff.

Dennis J. Roberts II, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

PER CURIAM.

The defendant, Spurwink/Rhode Island, appeals from a Superior Court judgment in favor of the plaintiff, Angelina M. Wellborn. Spurwink argues that the trial justice should have granted its motion for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, or in the alternative, that the trial justice should have granted Spurwink's motion for a new trial pursuant to Rule 59. This case came before the Court for oral argument on March 7, 2005, pursuant to an order directing all parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After considering the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we will proceed to decide the case at this time. For the reasons stated below, we deny the defendant's appeal.

## Facts and Procedural History

Beginning in early September 1997, until the events giving rise to the underlying case, Angelina Wellborn worked as a residential instructor at the Brook Manor Group Home in Hope Valley, Rhode Island. Brook Manor is a group home operated by defendant corporation, Spurwink/Rhode Island, for developmentally disabled adults, where, at the time of Wellborn's employment, there resided four older, nonverbal, disabled women. As a residential assistant, Wellborn's job consisted of such tasks as performing light household chores, assisting the residents with physical and occupational therapy, and taking the residents on community outings. Wellborn testified that during her employment by Spurwink, she worked approximately twenty-eight hours per week, as a part-time employee. At the outset of her employment, she informed her superiors of her desire for a full-time position when one became available.

In June 1998, Wellborn, then five months pregnant, was informed by her superior, program manager Gretchen Dante, that she needed to get a doctor's note detailing any pregnancy-related job restrictions. Soon after, Wellborn visited her obstetrician, Dr. David Small, and received a note explaining her medical status. The note, addressed to "Whomever," stated the following:

> "Ms. Angelina Wellborn is currently pregnant with expected due date of 31 October, 1998. Angie is capable of doing the routine functions of her job except that she should not be lifting [greater than] 20 lbs without assistance or lifting patients. Angie should not be involved with physically restraining group home patients. She should not be working on ladders/stools or overhead. Light cleaning chores ok."

Wellborn gave this note to Dante within a week of receiving it, and heard nothing further regarding her duties at Brook Manor. Nearly two months later, however, a full-time position became available, but it was offered to a different employee. At nearly the same time, in early September, Wellborn was informed by Dante that she had to begin her maternity leave immediately because of the restrictions detailed in the doctor's note. Wellborn later testified that Dante considered her to be a "liability" to the company due to those restrictions.

Despite Wellborn's objections to leaving, and her insistence that remaining on the job would not put her health, the health of her unborn child, or the health of the Brook Manor residents in jeopardy, Spurwink insisted that she take her leave immediately. Wellborn testified that her superiors stressed that her doctor's note was the reason for their action. Wellborn further testified that she never, before or during her pregnancy, needed to physically restrain a resident, and that there was always at least one other worker on duty to provide assistance in case Wellborn were called upon to perform any of the tasks from which her doctor had advised that she refrain. After she was unable to convince her superiors of her ability to stay on the job, Wellborn began her maternity leave in early September. Because her maternity leave commenced prematurely, Wellborn wrote to Ray Arsenault, executive director of Spurwink/Rhode Island, and requested an additional four weeks of leave to provide for adequate recovery time before returning to work. Her extended leave was granted, and Wellborn had little other contact with her employer until just before her anticipated return date.

When she returned to the Brook Manor Home, Wellborn was scheduled to work

seventeen hours for her first week, and twenty for the second, compared with her usual twenty-five hours of work per week. She subsequently learned that she had been downgraded from her part-time position to that of fill-in, meaning that she lost both her benefits and any guarantee of work in any particular weekly schedule. Wellborn spoke to Dante about the situation and was informed that there were no hours available for her, and that it was unknown when any hours would become available. In response, Wellborn asked Dante whether she was being fired, and when Dante responded in the negative, Wellborn quit, unable to support her family without having a guarantee of regular income-generating work. Wellborn later filed suit against Spurwink, her supervisor, Gretchen Dante, and Spurwink executive director Ray Arsenault, alleging sexual discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e–2, the Rhode Island Civil Rights Act, G.L.1956 § 42–112–1, and the Rhode Island Fair Employment Practices Act, G.L.1956 § 28–5–7.

A jury trial was held between September 30 and October 9, 2003. Prior to jury deliberations, but after each side had presented its case, the court granted Spurwink's Rule 50 motion for judgment as a matter of law relating to Gretchen Dante, but denied the motion relating to Ray Arsenault and Spurwink. The jury returned a verdict in favor of Wellborn, and awarded her $25,000, together with interest and costs. After the verdict was returned, defendant renewed its motion for judgment as a matter of law for Ray Arsenault and Spurwink pursuant to Rule 50, and made a Rule 59 motion for a new trial. The trial justice granted the Rule 50 motion for Ray Arsenault, denied it for Spurwink, and denied defendant's motion for a new trial. Subsequently, Spurwink filed the present appeal, claiming that the trial justice

should have granted either its Rule 50 or Rule 59 motions because, defendant asserts, "there is absolutely no evidence in the record to show that [Wellborn] was the victim of any adverse employment practice or any discriminatory animus by defendant, Spurwink."

## Standard of Review

■■■■ It is well settled that when reviewing the decision of a trial justice on a motion for judgment as a matter of law, this Court applies the same standards as the trial court. *Francis v. American Bankers Life Assurance Co. of Florida*, 861 A.2d 1040, 1045 (R.I.2004). "Without weighing the evidence or evaluating the credibility of witnesses, the trial justice must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. * * * 'If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination.'" *Id.* (quoting *Gallucci v. Humbyrd*, 709 A.2d 1059, 1062 (R.I.1998)). The standard is equally well established when reviewing the denial of a motion for a new trial. Sitting as a super juror, the trial justice, when deciding a motion for a new trial, "is required to independently weigh, evaluate, and assess the credibility of the trial witnesses and evidence. If the trial justice determines that the evidence is evenly balanced or is such that reasonable minds, in considering the same evidence, could come to different conclusions, then the trial justice should allow the verdict to stand." *Graff v. Motta*, 748 A.2d 249, 255 (R.I.2000) (quoting *Morrocco v. Piccardi*, 713 A.2d 250, 253 (R.I.1998)). "On appeal, '[t]his Court will affirm a trial justice's decision on a motion

for a new trial as long as the trial justice conducts the appropriate analysis, does not overlook or misconceive material evidence, and is not otherwise clearly wrong.' * * * Thus, his or her decision 'will be accorded great weight.'" *Amphavannasouk v. Simoneau,* 861 A.2d 451, 453 (R.I.2004).

## Analysis

Wellborn's primary contention in the underlying case is that defendant took adverse employment action against her because of her status as a pregnant woman. She alleged that she was discriminated against in the workplace because of her sex and pregnancy. In the first count of her complaint, Wellborn alleged violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e–2. Under that law, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The second count of Wellborn's complaint alleged violations of the Rhode Island Civil Rights Act, § 42–112–1. It is well established by the Rhode Island Supreme Court, and acknowledged by the District Court for the District of Rhode Island, that the Rhode Island Civil Rights Act "provides broad protection against all forms of discrimination in all phases of employment." *Rossi v. Amica Mutual Insurance Co.,* 2005 WL 309975 at * 6 (D.R.I.2005) (quoting *Ward v. City of Pawtucket Police Dept.,* 639 A.2d 1379, 1381 (R.I.1994)). Section 42–112–1(a) provides in pertinent part:

"All persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have * * * the same rights to make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and are subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Finally, Wellborn's third count alleged violations of the Rhode Island Fair Employment Practices Act, § 28–5–7(1)(ii), which provides in pertinent part that it is unlawful for any employer to "discharge an employee or discriminate against him or her with respect to hire, tenure, compensation, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment" because of "his or her race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin." Section 28–5–7(1)(i).

It is undisputed that discrimination based on pregnancy falls under the umbrella of sex discrimination. *See* 42 U.S.C.2000e(k) ("[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy"); *see also* § 28–5–6. To prove her case, a woman attempting to prove discrimination based on pregnancy must resort to the burden-shifting framework established for proving intentional discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Casey v. Town of Portsmouth,* 861 A.2d 1032, 1036 (R.I. 2004). Under that framework,

"a plaintiff can establish a prima facie case of pregnancy discrimination by showing that (1) she is pregnant (or has indicated an intention to become pregnant), (2) her job performance has been satisfactory, but (3) the employer nonetheless dismissed her from her position

(or took some other adverse employment action against her) while (4) continuing to have her duties performed by a comparably qualified person. * * * Establishing the prima facie case raises a rebuttable presumption that discrimination sparked the adverse employment action, * * * and imposes upon the employer a burden to put forward a legitimate, nondiscriminatory motive for the action. * * * If the defendant clears this modest hurdle, the presumption of discrimination vaporizes * * * and the plaintiff (who retains the ultimate burden of persuasion on the issue of discriminatory motive throughout) must then prove that the employer's proffered justification is a pretext for discrimination." *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 421 (1st Cir.1996).

We take this opportunity to address the defendant's contention that *Casey* is dispositive of the instant appeal. In *Casey,* the plaintiff sued the defendant town, asserting that the town's decision to hire a younger applicant for a utilityman position was based on age discrimination. This Court affirmed summary judgment in the town's favor, holding that the plaintiff failed to meet his burden of proof as to whether the defendant's legitimate, nondiscriminatory reason for not hiring the plaintiff was mere pretext and that the defendants had discriminated against him based on his age. We determined that even though "subjective legitimate, nondiscriminatory reasons could potentially mask discriminatory animus when proffered in failure to hire cases, they do not necessarily warrant a finding of pretext." *Casey,* 861 A.2d at 1039. *Casey* is distinguishable from the present appeal not only in its distinct factual differences, but also because the trial justice, in denying the motion for judgment as a matter of law, found that Wellborn had met her burden by offering evidence that Spurwink's proffered

reasons for their employment actions were pretexts for discrimination. This is in contrast to the situation in *Casey,* in which this Court affirmed summary judgment when "no reasonable jury could infer intentional discrimination from all the evidence including plaintiff's prima facie case." *Id.*

■ In this case, the parties agree that at the time of the events giving rise to this appeal, Wellborn, as a pregnant woman, was a member of a protected class. What defendant posits, however, as the basis for its appeal on both its Rule 50 and Rule 59 motions, is that there is no evidence to show that Wellborn was the victim of any adverse employment practice or discriminatory animus by Spurwink.

We disagree with defendant's assertion. On Spurwink's motion for judgment as a matter of law, considering the evidence in the light most favorable to Wellborn, there is ample evidence to uphold the trial justice's determination that sufficient evidence existed upon which the jury could deliberate and reach a verdict. Without weighing the evidence or assessing the credibility of witnesses, the trial justice found that there were factual issues upon which reasonable persons could draw different conclusions concerning whether Wellborn had established a prima facie case of sex discrimination, and could rebut Spurwink's contention that nondiscriminatory reasons existed for the adverse employment actions.

Wellborn's allegation of adverse employment action by Spurwink is three-fold. She alleges that she was bypassed for promotion, forced to take premature maternity leave, and constructively discharged because of her pregnancy. In relation to Spurwink's failure to hire Wellborn when a full-time position became available, one witness testified to having

heard Dante admit that Wellborn was not given the promotion because she was going on maternity leave. Dante testified that the full-time position was given to the most qualified candidate, a woman with less seniority than Wellborn, and denied that Wellborn's pregnancy played a role in the passed-over promotion. However, the evidence concerning the promotion, coupled with the evidence regarding Wellborn's early maternity leave and treatment upon her return, was sufficient to be submitted to the jury.

With respect to Spurwink's insistence that Wellborn commence her maternity leave well before she desired or planned to take a temporary leave, there is certainly sufficient evidence that Spurwink's actions may have been unnecessary and discriminatory. Wellborn herself testified to her desire to remain on the job and her belief that she could work without jeopardizing her own health or the care of the Brook Manor residents. Both Dante and Arsenault testified that Dr. Small's doctor's note was the primary reason for requiring that she leave, despite the lack of any company policy mandating leave at any set point in one's pregnancy, and both further testified that the note's restrictions on lifting and restraining patients were the motivating factors. Dante further testified that she felt Wellborn's job restrictions would put the residents at risk, while one witness testified that Arsenault told her that it was company policy that women not be allowed to work after a certain week in their pregnancy. Additional evidence was offered to show that there was no such company policy.

However, Wellborn's job description mentions neither restraint nor heavy lifting, and several witnesses testified to the rarity of restraint use, and emphasized that there are always other people on duty to assist in case the need for heavy lifting

or restraint were to arise. Further, Dr. Small testified that in his opinion Wellborn could have continued working, despite her pregnancy, and that he had spoken to Arsenault about Wellborn's capability to remain on the job. Despite defendant's emphasis on the role played by the restricted tasks in the job once occupied by Wellborn, and its reliance on records indicating certain residents' aggressive tendencies, the evidence is sufficient for reasonable minds to differ on the ultimate conclusion about whether Spurwink discriminated against Wellborn when it required that she prematurely commence her maternity leave.

Finally, concerning Wellborn's employment status upon her return from maternity leave, it is undisputed that she was downgraded from part-time to fill-in status, and that as a result she lost her benefits and any guarantee of paid working hours. Despite evidence showing Wellborn's past work performance to be satisfactory, and despite company policy that an employee is entitled to the same job classification, seniority, hours, and benefits after returning from maternity leave, Spurwink filled Wellborn's position, demoted her, and eliminated her benefits. Wellborn testified that she had no choice but to quit when she learned that she had been placed on fill-in status, despite Dante's insistence that Wellborn was not being terminated from her Spurwink employment. Thus, there is solid evidentiary support for allowing the jury to deliberate upon the actions taken by Spurwink in response to her pregnancy. In sum, we discern from the record sufficient evidence to support the trial justice's denial of Spurwink's motion for judgment as a matter of law.

With respect to Spurwink's Rule 59 motion for a new trial, the evidence was equally sufficient to support the trial justice's determination, sitting as a "super

juror" and weighing the evidence and assessing the credibility of the witnesses, that the evidence was balanced, reasonable minds could differ as to the verdict, and that it was proper for the jury to find in favor of Angelina Wellborn. In addition to citing lack of evidence of discriminatory intent as a justification for a new trial, Spurwink posits that there was no evidence in the record to support a jury instruction that Wellborn had been constructively discharged from her position at the Brook Manor Group Home. The jury charge contained the following instruction on the issue, to which Spurwink's initial objection was overruled:

"In addition to the claim of discrimination based upon her pregnancy, Mrs. Wellborn is saying that when she returned to her place of employment, Spurwink, that she was—what the law refers to as constructively discharged from her employment. And what means is a treatment towards the employee—towards a reasonable employee that no reasonable employee would tolerate and continue in that position. The standard that the jury must use is an objective one. You must determine whether the conditions were so difficult and so unpleasant that a reasonable person, standing in Mrs. Wellborn's shoes, would have felt compelled to resign."

Wellborn admitted that she quit her position at Spurwink after learning that she had been placed on fill-in status and would not be guaranteed any future working hours. Consequently, to determine whether Wellborn had been subject to constructive discharge, an actionable claim under Title VII, "the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Marley v. United Par-*cel Service, Inc.,* 665 F.Supp. 119, 129 (D.R.I.1987) (quoting *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir.1986)). The inquiry "naturally focuses on the reasonable state of mind of the assumed discriminatee * * * and requires proof of more than the usual workplace stress." *Id.* The evidence presented in this case is more than what is needed to pass this test; testimony showed that upon her return from leave, Wellborn lost her part-time position, along with benefits and guaranteed work hours, and that someone else had been hired to fill her former position. This cannot be considered usual workplace stress, and would compel any employee in need of a regular income to seek other employment.

The defendant further argues that it is entitled to a new trial because of jury confusion in the deliberation process. However, Spurwink waived its right to appeal on this issue when it failed to raise it at the trial level. For this reason, we decline to address the issue. In conclusion, after giving great weight to the trial justice's determination, we hold that the trial justice conducted the appropriate analysis, did not overlook or misconceive material evidence, and was not clearly wrong in her denial of Spurwink's motion for a new trial.

### Conclusion

For the foregoing reasons, we deny the defendant's appeal and affirm the judgment of the Superior Court, to which we return the papers in this case.