April 29, 2025

Evoqua Water Technologies LLC, et al. :

v. :

Matthew Moriarty et al. :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Evoqua Water Technologies LLC, et al.　:

v.　　　　　　　　　　:

Matthew Moriarty et al.　　　:

Present:　Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Long, for the Court.**　The defendant, Matthew Moriarty (defendant or Mr. Moriarty), appeals from a Superior Court order and judgment dismissing his amended counterclaim, which sought declaratory relief and tort damages against Evoqua Water Technologies LLC and Neptune-Benson, LLC (Evoqua and Neptune-Benson, together, plaintiffs).　The trial justice granted the plaintiffs' motion to dismiss all but one counterclaim on the basis of the litigation privilege; the remaining count was dismissed by stipulation of the parties.　We affirm the Superior Court's order and judgment dismissing Mr. Moriarty's amended counterclaim.

## Facts and Procedural History

The facts of this case flow from Mr. Moriarty's employment with non-party Neptune-Benson, Inc. (NBI) and, later, Evoqua.　NBI hired Mr. Moriarty in February

2010 as an inside sales representative; and Mr. Moriarty signed a Non-Disclosure, Non-Solicit, and Non-Compete Agreement (the 2010 agreement) that same month. The substantive terms in the 2010 agreement are not disputed. The 2010 agreement barred Mr. Moriarty from engaging in a competing business that marketed, designed, developed, or sold any competing products, and prevented him from soliciting either employees or customers of NBI away from NBI upon his departure. The noncompetition and nonsolicitation provisions in the 2010 agreement were valid for twenty-four months after the end of Mr. Moriarty's employment.

Evoqua agreed to purchase Neptune-Benson in April 2016. Evoqua hired Mr. Moriarty in January 2017 after the dissolution of a corporate entity formerly known as NBI. The plaintiffs commenced the underlying action against Mr. Moriarty in October 2018. They sought declaratory relief and asserted causes of action for breach of contract, breach of the duty of loyalty, unfair competition, misappropriation of trade secrets, conversion, civil conspiracy, and tortious interference with business relations, among others, stemming from Mr. Moriarty's alleged violations of the 2010 agreement. The plaintiffs contemporaneously sought injunctive relief to prohibit Mr. Moriarty's continued alleged violations of the 2010 agreement, and in January 2019 a justice of the Superior Court held a preliminary injunction hearing. At the hearing, Kenneth Rodi (Mr. Rodi), a former Evoqua executive, testified that "when Evoqua purchased the stock of Neptune-Benson in

April of 2016 * * * all liabilities and contracts transferred," including all employment contracts. Mr. Moriarty alleges that, when he testified at the preliminary injunction hearing, Mr. Rodi was referring to NBI.

The trial justice granted the preliminary injunction in May 2019. In addition to ruling that Evoqua had standing to challenge Mr. Moriarty's alleged violations of the 2010 agreement, the trial justice's order enjoined Mr. Moriarty from "engaging in any activities that violate [the 2010 agreement]" until June 2020—when the 2010 agreement expired.

Mr. Moriarty never appealed the preliminary injunction. Instead, in February 2022, counsel for Mr. Moriarty deposed Mr. Rodi as part of the ongoing litigation. At that deposition, Mr. Rodi testified that the corporate entity formerly known as NBI was neither sold nor merged with Evoqua and that, consequently, none of the assets or contracts of the corporate entity formerly known as NBI transferred to Evoqua upon its acquisition of Neptune-Benson. The defendant alleges that this testimony is contrary to his testimony at the hearing on the preliminary injunction.

On the basis of the perceived contradictions between Mr. Rodi's testimony at the preliminary injunction hearing and at his deposition, Mr. Moriarty filed an amended counterclaim asserting that Mr. Rodi had given false and fraudulent hearing testimony to obtain an injunction, thereby restricting "[Mr.] Moriarty's ability to be gainfully employed in the only industry he has worked [in] since

graduating college." Mr. Moriarty asserted nine causes of action: intentional infliction of emotional distress arising from the "severe and outrageous misconduct" of Mr. Rodi's perjurious testimony which caused emotional and pecuniary distress (count 1); negligent infliction of emotional distress arising from the same (count 2); a declaratory judgment that the 2010 agreement is unenforceable as neither plaintiff was a party, nor successor to a party to the 2010 agreement (count 3); a further declaratory judgment regarding a secrecy agreement referenced in the underlying complaint (count 4); constructive discharge triggered by the illegal trade practices employed by Evoqua which forced him to resign (count 5); negligent misrepresentation by Mr. Rodi concerning the circumstances surrounding the acquisition of Neptune-Benson (count 6); fraudulent misrepresentation arising from the same (count 7); interference with prospective contractual relations caused by the injunction (count 8); and interference with prospective economic advantages caused by the same (count 9).

The plaintiffs filed a motion to dismiss Mr. Moriarty's amended counterclaim. In their motion, plaintiffs asserted that counts 1, 2, and 6 through 9 were based on statements made during the preliminary injunction hearing and were therefore barred by the litigation privilege; that counts 1, 2, 6, and 7 should be dismissed because they were brought outside the statute of limitations for tort claims; and that counts 1 through 3 and 5 through 9 each fail to state a claim upon which relief could be

granted. Mr. Moriarty opposed the motion to dismiss, arguing that the trial court should not apply a blanket privilege barring his claims related to Mr. Rodi's testimony because the Court should undertake a case-by-case-review, and assess the public policy implications, of applying the litigation privilege to his allegations. Furthermore, he argued that his claims were not barred by the statute of limitations and did not fail to state a claim for relief.

The plaintiffs' motion to dismiss was heard before a justice of the Superior Court on November 21, 2022. At the hearing, the trial justice granted the motion to dismiss. The trial justice explained her reasoning from the bench and cited *Ims v. Town of Portsmouth*, 32 A.3d 914 (R.I. 2011), for the proposition that "[a]n absolute privilege is afforded in the context of judicial proceedings to encourage witnesses to come forward and speak freely about civil or criminal matters." *Ims*, 32 A.3d at 928. The court was not persuaded by Mr. Moriarty's claim that the privilege required a case-by-case analysis; instead, in the trial justice's view, the "absolute privilege" required dismissal of all of the counts contested in Mr. Moriarty's amended counterclaim because they were based on Mr. Rodi's privileged testimony at the preliminary injunction hearing.

The trial justice entered an order dismissing counts 1 through 3 and 5 through 9 of the amended counterclaim on December 15, 2022. The parties dismissed by stipulation the underlying action and count 4 of Mr. Moriarty's amended

counterclaim, and the Superior Court thereafter entered judgment for plaintiffs. Mr. Moriarty filed a notice of appeal on April 20, 2023.

**Standard of Review**

When this Court reviews a lower court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, "we adhere to the same standard as did the [trial] justice." *Serenska v. Wells Fargo Bank, N.A.*, 307 A.3d 1275, 1279 (R.I. 2024). "The sole function of a motion to dismiss is to test the sufficiency of the [counterclaim]." *EDC Investment, LLC v. UTGR, Inc.*, 275 A.3d 537, 542 (R.I. 2022) (quoting *Pontarelli v. Rhode Island Department of Elementary and Secondary Education*, 176 A.3d 472, 476 (R.I. 2018)). The trial justice "must look no further than the [counterclaim], assume that all allegations in the [counterclaim] are true, and resolve any doubts in a plaintiff's favor." *Serenska*, 307 A.3d at 1279 (quoting *Pontarelli*, 176 A.3d at 476). We will affirm the trial justice's dismissal when "it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim." *EDC Investment, LLC*, 275 A.3d at 542. Furthermore, this Court reviews questions of law *de novo*. *Shepard v. Harleysville Worcester Insurance Company, Inc.*, 944 A.2d 167, 170 (R.I. 2008). In reviewing a trial justice's legal determination, this Court is free to affirm that determination on "grounds different from those enunciated in [her or his] decision

- 6 -

"\* \* \*." *Preserve at Boulder Hills, LLC v. Kenyon*, 312 A.3d 475, 480 (R.I. 2024) (quoting *Miller v. Metropolitan Property and Casualty Insurance Co.*, 111 A.3d 332, 339 (R.I. 2015)).

## Analysis

Mr. Moriarty's claims of error on appeal require this Court to assess the scope of the litigation privilege and whether that privilege encompasses the allegations contained in Mr. Moriarty's amended counterclaim. We affirm the dismissal of counts 1, 2, and 6 through 9 on the basis of that privilege, and counts 3 and 5 on other grounds.

This Court adopted the litigation privilege in 1956. *See Vieira v. Meredith*, 84 R.I. 299, 301, 123 A.2d 743, 744 (1956). In *Vieira*, the Court recognized that certain communications in connection with judicial proceedings are immune from suit because they enjoy an absolute privilege. *Id.* ("[L]ibelous matter in pleadings filed in judicial proceedings are absolutely privileged where the statements are material, pertinent or relevant to the issues therein \* \* \*."). This absolute privilege "is afforded in the context of judicial proceedings to encourage witnesses to come forward and speak freely about civil or criminal matters." *Ims*, 32 A.3d at 928. The "privilege exists because 'it is more important that witnesses be free from the fear of civil liability for what they say than that a person who has been [harmed] by their testimony have a remedy.'" *Id.* (quoting *Aborn v. Lipson*, 256 N.E.2d 442, 443

(Mass. 1970)).  "The key to establishing whether absolute privilege applies to a particular communication is determining whether it was made in the context of a judicial or quasi-judicial proceeding." *Id.*  This Court has held that judicial proceedings include "any proceeding wherein judicial action is invoked and taken." *Roberts v. City of Cranston Zoning Board of Review*, 448 A.2d 779, 781 (R.I. 1982) (brackets omitted) (quoting Black's Law Dictionary 762 (5th ed. 1979)); *see Ims*, 32 A.3d at 929 (determining that statutorily required notice to town council was not subject to litigation privilege because communication was prerequisite to judicial proceeding and not part of a judicial proceeding itself).

Counts 1, 2, and 6 through 9 of Mr. Moriarty's amended counterclaim are based on Mr. Rodi's testimony at the hearing on plaintiffs' motion for a preliminary injunction.  Mr. Moriarty alleges that this testimony was "extreme and outrageous" (counts 1 and 2), negligently and/or fraudulently misrepresented the facts (counts 6 and 7) and interfered with his business relations (counts 8 and 9).  It is axiomatic that a hearing on a motion for a preliminary injunction is the kind of proceeding "wherein judicial action is invoked and taken." *Roberts*, 448 A.2d at 781 (quoting Black's Law Dictionary 762 (5th ed. 1979)).  Mr. Rodi's testimony is entitled to the protection of the litigation privilege because he gave that testimony in response to questions regarding Mr. Moriarty's employment at a hearing concerning alleged violations of his employment agreement. *Vieira*, 84 R.I. at 301, 123 A.2d at 744

(applying privilege to statements that are "material, pertinent or relevant to the issues" presented in a judicial proceeding); *see O'Coin v. Woonsocket Institution Trust Company*, 535 A.2d 1263, 1267 (R.I. 1988) (holding a "witness cannot be held liable in a civil suit for his answer" to a question asked in open court because "[t]o hold otherwise would be manifestly unfair to the witness, who often, but not always[,] is untrained in legal matters, timid, and appears at the behest of some third party"). Therefore, his testimony at that hearing cannot form the basis of this or any future suit. *See Vieira*, 84 R.I. at 301, 123 A.2d at 744. For this Court to rule otherwise would undermine nearly seventy years of precedent. *See id.* The trial justice was correct to dismiss counts 1, 2, and 6 through 9 based on the litigation privilege, and we accordingly affirm.[1]

However, the dismissal of counts 3 and 5 of Mr. Moriarty's amended counterclaim on the basis of the litigation privilege was error. Counts 3 and 5 do not rely on, or arise from, testimony given at the preliminary injunction hearing. Nevertheless, this Court is free to affirm the trial justice on grounds other than those relied on in the trial court. *Preserve at Boulder Hills*, 312 A.3d at 480.

---

[1] Mr. Moriarty urges this Court to adopt or apply a case-by-case analysis to the litigation privilege by citation to nonbinding precedent from other states and disparate federal district and circuit courts. However, in light of binding Rhode Island caselaw clearly stating our view of the litigation privilege, we need not address those nonbinding authorities.

Consequently, we affirm the dismissal of these additional claims for the reasons provided herein.

Count 3 of Mr. Moriarty's amended counterclaim sought a declaratory judgment that the noncompetition provision of the 2010 agreement is not enforceable by these plaintiffs because NBI is a nonparty to the present action, and neither plaintiff is a successor to a signatory to the 2010 agreement. The plaintiffs sought to dismiss count 3 on mootness grounds, because the noncompetition provision of the 2010 agreement expired in 2020. Mr. Moriarty countered that, notwithstanding the expiration of the noncompetition provision of the 2010 agreement, he had suffered damages as a consequence of the preliminary injunction, which, he argued, the trial justice issued on the basis of Mr. Rodi's testimony; and, therefore, he contends that a declaration of unenforceability would entitle him to damages.

"If this Court's judgment would fail to have a practical effect on the existing controversy, the question is moot, and we will not render an opinion on the matter." *In re Episcopal Diocese of Rhode Island*, 289 A.3d 164, 168 (R.I. 2023) (quoting *City of Cranston v. Rhode Island Laborers' District Council, Local 1033*, 960 A.2d 529, 533 (R.I. 2008)). There are certain narrow exceptions to the mootness doctrine that arise when an issue is of "*extreme* public importance" and is "capable of repetition but evad[ing] review." *Campbell v. Tiverton Zoning Board*, 15 A.3d 1015,

- 10 -

1022 (R.I. 2011) (quoting *H.V. Collins Co. v. Williams*, 990 A.2d 845, 848 (R.I. 2010)). This Court exercises its own discretion in determining if a matter raised on appeal falls within these narrow exceptions. *City of Cranston*, 960 A.2d at 534.

Mr. Moriarty's declaratory-judgment action is moot because the noncompetition provision of the 2010 agreement expired in June 2020, as did the preliminary injunction that enforced the agreement. This Court has previously held that litigation premised on an expired contract becomes moot when that contract expires. *City of Cranston*, 960 A.2d at 534; *see also Town of Scituate v. Scituate Teachers' Association*, 110 R.I. 679, 683-84, 296 A.2d 466, 468-69 (1972) (holding that expiration of two-year collective-bargaining agreement effectively mooted any question at the appellate level). There is no reason for this Court to resurrect the noncompetition provisions of the 2010 agreement to determine the correct party to pursue this litigation because the noncompetition provision of the 2010 agreement became unenforceable upon expiration. *See City of Cranston*, 960 A.2d at 534. Therefore, even if this Court were to reach the issue that Mr. Moriarty has raised regarding the correct corporate entity to enforce the 2010 agreement, a decision in either party's favor would have no practical effect on the underlying controversy because no party could enforce the expired terms of the 2010 agreement. *In re Episcopal Diocese*, 289 A.3d at 168.

- 11 -

Moreover, Mr. Moriarty's argument that he would be entitled to seek damages upon a declaration of unenforceability of the 2010 agreement fails. Even were this Court to determine that these plaintiffs may not enforce the noncompetition provision of the 2010 agreement and that therefore the trial justice erroneously issued the preliminary injunction, Mr. Moriarty is not entitled to damages absent a showing of malicious prosecution, which his allegations do not support. *Truk Away of Rhode Island, Inc. v. Macera Bros. of Cranston, Inc.*, 643 A.2d 811, 816 (R.I. 1994).

Mr. Moriarty's argument that count 3 fits within the narrow exceptions to the mootness doctrine also fails. This Court undertakes a *de novo* review of the application of these exceptions. *City of Cranston*, 960 A.2d at 534. For a case to fall within the first exception to the mootness doctrine, that a dispute is capable of repetition but evading review, there must be a "reasonable expectation that the same complaining party would be subjected to the same action again." *Boyer v. Bedrosian*, 57 A.3d 259, 281 (R.I. 2012) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Here, there is no reasonable expectation that Mr. Moriarty will be subject to another action by these plaintiffs because it is unreasonable to assume that any party, including these plaintiffs, would seek to enforce the terms of an expired contract. *See id.*

With respect to the second exception to the mootness doctrine, Mr. Moriarty argues that this case involves matters of "extreme public importance" because that exception includes "matters concerning a person's livelihood." (Quoting *City of Cranston*, 960 A.2d at 533.) However, although the noncompetition provision of the 2010 agreement undoubtedly impacted his livelihood between the time he resigned from Evoqua and the time that provision expired, it has no effect on his livelihood now, five years after its expiration. *See In Re New England Gas Company*, 842 A.2d 545, 554 (R.I. 2004) (finding that settlement of labor dispute mooted issue regarding disclosure of employee information because even though "the release of such information may well have been a matter concerning the livelihoods of many persons," that concern lasted only "during the pendency of that particular labor dispute"). Thus, count 3 does not fit within either narrow exception to the mootness doctrine, and the claim was appropriately dismissed.

Mr. Moriarty alleges, finally, that he was constructively discharged from his employment at Evoqua (count 5). At the outset, we note that this count fails to state a claim for relief because constructive discharge is not a stand-alone cause of action. Instead, and as Mr. Moriarty has acknowledged in his briefing before this Court, it stands in for the adverse employment action element of a statutory employment discrimination or retaliation claim. *See Bucci v. Hurd Buick Pontiac GMC Truck, LLC*, 85 A.3d 1160, 1170 (R.I. 2014) (listing the elements of an employment

discrimination claim). Here, Mr. Moriarty's amended counterclaim does not contain a cause of action for employment discrimination or retaliation but, instead, merely lists "constructive discharge" as a stand-alone count. Absent a claim for some broader statutory violation, however, this count does not state a claim for relief.

Furthermore, Mr. Moriarty's amended counterclaim, even if liberally interpreted as a claim for an unspecified statutorily prohibited employment practice, fails to establish the element of constructive discharge to state such a claim. To successfully allege constructive discharge, an employee must show that their "working conditions had become so difficult that a reasonable person in [their] position would have felt compelled to resign." *Ferreira v. Child and Family Services*, 222 A.3d 69, 77 (R.I. 2019). In analyzing these claims, the focus is "on the reasonable state of mind of the assumed discriminatee * * * and requires proof of more than the usual workplace stress." *Wellborn v. Spurwink/Rhode Island*, 873 A.2d 884, 891 (R.I. 2005) (quoting *Marley v. United Parcel Service, Inc.*, 665 F. Supp. 119, 129 (D.R.I. 1987)) (finding constructive discharge established where the plaintiff, upon return from leave, had lost former position, along with benefits and guaranteed work hours).

In the past, we have looked to decisions of the United States Court of Appeals for the First Circuit in assessing claims of employment discrimination and constructive discharge; decisions from that court offer guidance here. *See Ferreira*,

- 14 -

222 A.3d at 77 (noting that this Court has adopted the federal framework for analyzing employment discrimination claims); *Wellborn*, 873 A.2d at 891 (using federal standard to assess constructive discharge under Title VII). Under the standard elucidated by the First Circuit, the appropriate inquiry in evaluating constructive discharge is not "whether * * * conditions [in the workplace] were difficult or unpleasant," but whether "at the time of [an employee's] resignation, [their] employer did not allow [them] the opportunity to make a free choice regarding [their] employment relationship." *Torrech-Hernández v. General Electric Company*, 519 F.3d 41, 50 (1st Cir. 2008) (quoting *Exum v. United States Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004)). This is established through pleadings and evidence that tend to show that "working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." *Suarez v. Pueblo International, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000). "[A] change in the way that business is done, unaccompanied by diminution of salary or some other marked lessening of the quality of working conditions, does not constitute" constructive discharge. *Id.* at 55. The constructive-discharge analysis is objective and "do[es] not put weight on the employee's subjective beliefs" no matter how sincerely an employee believes that an employer's conduct crosses a line. *Equal Employment Opportunity Commission v. Kohl's Department Stores, Inc.*, 774 F.3d 127, 134 (1st

- 15 -

Cir. 2014) (holding constructive discharge was not established where employee resigned prematurely in lieu of engaging in discussion regarding requested accommodations that were offered to her by employer).

Mr. Moriarty alleges that after its 2016 acquisition of Neptune-Benson, Evoqua engaged in "illegal, unethical, and deceptive trade practices" that compelled him to resign. His allegations are that Evoqua "cook[ed] the books" to inflate sales numbers, causing Mr. Moriarty to "los[e] significant commissions." Specifically, Evoqua artificially inflated its sales numbers by "convinc[ing customers] to take delivery of orders much earlier than the customers required them" so that Evoqua could meet its sales goals. And Mr. Moriarty lost out on commission when customers learned about this conduct, and "with[eld] orders until management called them * * * to receive discounts," and "would do the same thing prior to shipping * * * [to get] a second discount." Mr. Moriarty averred that "these discounts were orchestrated by management * * * [t]hereby reducing Moriarty's expected sales commission without his knowledge." Evoqua subsequently increased Neptune-Benson's sales goal by 30 percent above the discounted sales numbers, which Mr. Moriarty knew was impossible to meet given the steep discounts at which earlier sales were made. In order to make up the lost sales, Evoqua engaged in further tactics to keep sales numbers inflated, like "offering shipping containers on top of steep discounts and extended payment terms[,]" even while Evoqua continued to

miss its sales targets and changed "sales goals throughout the year to avoid paying bonuses." Finally, Mr. Moriarty alleged that Evoqua deliberately sent products to customers that they did not need to inflate sales and earnings figures, and rescinded Mr. Moriarty's accrued time off to drop it from its balance sheet.

Taking these allegations as true, Mr. Moriarty fails to state a claim for relief because he has not shown how Evoqua's allegedly aggressive business tactics resulted in the diminution of his working conditions to the point that he had no choice but to resign. *Ferreira*, 222 A.3d at 77. Instead, although Mr. Moriarty plausibly alleges that Evoqua engaged in aggressive marketing and sales tactics after its acquisition of Neptune-Benson, the conclusory allegations in Mr. Moriarty's amended counterclaim are insufficient to show that he was subject to anything greater than typical workplace stress occasioned by the corporate reorganization of the business after Evoqua's acquisition. *See Wellborn*, 873 A.2d at 891. To be sure, his allegation that Evoqua's conduct was somehow illegal is concerning, but mere recitals of illegality supported only by conclusory statements cannot survive our 12(b)(6) standard. *Chhun v. Mortgage Electronic Registration Systems, Inc.*, 84 A.3d 419, 422-23 (R.I. 2014). Furthermore, even if Mr. Moriarty sincerely believed that Evoqua's conduct was illegal and unethical, that is irrelevant to our analysis of whether he has established his claim for constructive discharge because we review those claims from an objective viewpoint. *Equal Employment Opportunity*

- 17 -

*Commission*, 774 F.3d at 134. In engaging in that objective assessment of his claims, we conclude that, though changes to the company's sales policies undoubtedly caused Mr. Moriarty stress and may have made his work less lucrative, he has failed to allege conduct from which this Court can determine that his resignation was objectively devoid of free will as a result of onerous and abusive employment practices. *Torrech-Hernández*, 519 F.3d at 50. Mr. Moriarty does not allege that his job responsibilities changed, that he received a demotion, that his salary was reduced, or any other objective indicia that the conditions of his workplace had become so onerous, abusive, or unpleasant that he had no choice but to leave. *See Calhoun v. Acme Cleveland Corporation*, 798 F.2d 559, 562-63 (1st Cir. 1986) (finding that older employee could survive summary judgment where he alleged that he was threatened with twelve- to fourteen-hour days, was repeatedly asked about resignation, was demoted, and had younger employees promoted above him); *Suarez*, 229 F.3d at 54. Instead, his resignation appears to have been based on Evoqua's new sales strategies, which had the effect of reducing his commission; but that alone cannot sustain a claim for constructive discharge because it would not, by itself, cause a reasonable person to believe that their only choice was to resign. *Ferreira*, 222 A.3d at 77; s*ee Equal Employment Opportunity Commission v. Sears, Roebuck & Co.*, 233 F.3d 432, 441 (7th Cir. 2000) ("While [resignation] was certainly [the employee's] prerogative, we do not believe this was [the] only

option.").   We therefore conclude that the dismissal of count 5 of Mr. Moriarty's amended counterclaim was not erroneous.

## Conclusion

For the foregoing reasons, we affirm the order and judgment of the Superior Court dismissing Mr. Moriarty's amended counterclaim and remand the record.



**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | Evoqua Water Technologies LLC, et al. v. Matthew Moriarty et al. |
| **Case Number** | No. 2023-250-Appeal. (PC 18-7572) |
| **Date Opinion Filed** | April 29, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Stephen T. Melnick, Esq.<br>For Defendant:<br><br>Andrew R. Bilodeau, Esq. |